Argued and submitted January 11, 2011, affirmed February 29, 2012

In the Matter of the
Estate of Maxine Vogel.

Kent BIGSBY,
Karen J. Morrow and Anita K. Clift,
*Appellants,*

*v.*

Robert VOGEL,
Personal Representative of the
Estate of Maxine Vogel,
*Respondent.*

Umatilla County Circuit Court
PR080078; A144263

273 P3d 284

George W. Kelly argued the cause and filed the briefs for appellants.

Patrick M. Gregg argued the cause for respondent. With him on the brief were Douglas E. Hojem and Corey, Byler, Rew, Lorenzen and Hojem, L.L.P.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

This is an appeal from a judgment of final distribution arising out of a probate proceeding involving the estate of Maxine Vogel (the decedent). The probate court determined that certain assets retained by the estate were personal property and, consequently, ordered that they be distributed to respondent, the decedent's husband and the residual beneficiary under her will. Appellants, the decedent's three children, argue that, under the Uniform Principal and Income Act (UPIA), ORS chapter 129, the assets should have been allocated as principal to a testamentary trust that was created by stipulation of the parties for the net proceeds from the sale of the decedent's real property, a trust in which appellants maintained a remainder interest. Alternatively, appellants argue that the disputed assets are properly considered real property and, consequently, they are entitled to a remainder interest under the decedent's will. We affirm.

We review the trial court's legal conclusions for errors of law and are bound by the court's findings of historical fact so long as there is any evidence to support them.[1] ORS 111.105(2) ("Appeals from a circuit court sitting in probate shall be taken to the Court of Appeals in the manner provided by law for appeals from the circuit court."); ORS 19.415(3)(b) (providing for discretionary *de novo* review of most equitable actions); *State v. S. T. S.*, 236 Or App 646, 654-55, 238 P3d 53 (2010) (articulating standard of review under ORS 19.415(3)(b) where *de novo* review is not exercised). In the present case, the historical facts are, in any event, undisputed.

Before her death, the decedent signed an earnest money agreement selling her ranch. That sale fell through, entitling the decedent to $30,000 in forfeited earnest money. The decedent began negotiating another sale of the ranch

---

[1] We have traditionally reviewed probate court proceedings *de novo. See, e.g., McIntire v. Lang*, 241 Or App 518, 520 n 1, 254 P3d 745 (2011); *Brown v. Hackney*, 228 Or App 441, 443, 208 P3d 988 (2009); *Stanfield v. Stanfield*, 192 Or App 447, 449, 86 P3d 77, *rev den*, 337 Or 160 (2004). However, *de novo* review is now discretionary in most equitable cases, like this one, in which the notice of appeal was filed after June 4, 2009. ORS 19.415(3)(b). The parties have not requested that we exercise our discretion to review this matter *de novo*, and we see no reason to do so.

and, on January 28, 2008, signed an agreement to sell it for $1,800,000. At the time, the ranch was subject to a "farm lease," under which the decedent was apparently entitled to a 40 percent "landlord's share" of the then-growing 2008 wheat crop (2008 crop share).[2] The decedent and the buyer originally agreed that the buyer would receive the 2008 crop share, as well as the 2008 "CRP payments" associated with the ranch.[3] The decedent and the buyer subsequently renegotiated the terms of the sale and, on February 26, 2008, entered into an "Addendum to Real Estate Sale Agreement," under which the parties agreed to a reduced sales price of $1,500,000, with the decedent, rather than the buyer, retaining the 2008 crop share and CRP payments.

The decedent died on May 24, 2008, before the sale of the ranch closed and before the 2008 wheat crop was harvested. Her husband and children survived her. The decedent's will, as pertinent to this case, provided:

"A.  All real property I may own at the time of my death, to my husband, [respondent], for his life, remainder to my three children, [appellants], in equal shares.

"B.  All the rest, residue and remainder of my estate, real, personal or mixed, of which I may die seized or possessed or to which I may be entitled at the time of my death, to my husband, [respondent], absolutely and without limitation. * * *"

The will was admitted to probate on June 17, 2008, and respondent was appointed personal representative. On June 18, 2008, the forfeited earnest money from the initial, uncompleted sale was received by the decedent's estate. On

---

[2] The record does not disclose the details of the lease.

[3] The parties refer to "CRP payments" in their briefing on appeal, meaning payments from the Conservation Reserve Program established by the federal government; under that program, farmers, in exchange for annual payments, agree to reduce certain cropland and to implement particular conservation initiatives developed or approved by the United States Department of Agriculture. *See* 16 USC § 3801(a)(20); 16 USC §§ 3831-3835. However, at the hearing on appellants' objections to the final accounting of the decedent's estate—the hearing that resulted in the judgment appealed from here—the parties agreed that the reference is meant to include all 2008 government program payments, *including* CRP payments, although the other programs are not identified in the record. For convenience, we follow the parties' lead and refer to the government program payments as CRP payments.

approximately July 28, 2008, respondent, as personal representative of the decedent's estate, closed the sale of the ranch. As contemplated by the February 26, 2008, addendum to the real estate agreement, proceeds from the 2008 crop share and the CRP payments were eventually received and retained by the decedent's estate.

The parties stipulated to the creation of a "constructive implied testamentary trust for the estate of [the decedent]" under ORS chapter 130, the Uniform Trust Code. The stipulated order, which was approved by the court, provided that the $1,206,035.27 in net proceeds from the sale of the ranch that had been disbursed to respondent and deposited in specified accounts, as well as a $200,000 trust deed and installment note for the balance of the purchase price of which respondent was the beneficiary, were to be transferred to the trust. The order further provided that "[a]ll income from [the trust] shall be distributed for the benefit of [respondent] for his life * * *, and upon the death of [respondent], the remainder of all funds shall be distributed to [appellants] or their heirs by right of representation."

Thereafter, respondent filed a "Final Account and Petition for General Judgment of Final Distribution" to which appellants objected. As pertinent to this appeal, appellants challenged the distribution of certain funds—specifically, the 2008 crop share ($107,735.16), 2008 CRP payments ($11,129.58), and forfeited earnest money ($30,000)—to respondent. Initially, appellants objected on the ground that that they were "entitled under the Will to a remainder interest in all real property of the estate."[4] In subsequent filings, however—specifically, a trial memorandum and post-hearing proposed findings of fact and conclusions of law—appellants argued that the UPIA governed and that, under that act, the disputed assets should have been allocated to the principal of the stipulated testamentary trust, of which they are the remainder beneficiaries. Respondent, on the other hand, contended that the funds were properly allocated

---

[4] To be more precise, that assertion—that they were entitled to the disputed assets under the decedent's will—was made only by appellants Karen Morrow and Anita Clift. All three appellants, however, eventually argued before the probate court that the UPIA controlled.

to him under the terms of the decedent's will—either because they are personal property or because they constitute income from real property to which he, as the life-estate holder, is entitled—and, therefore, that the "default" provisions of the UPIA were not applicable. Respondent also argued that, even under the UPIA, the disputed assets were appropriately allocated to income, not principal as appellants contended.

The court ruled in favor of respondent, concluding in a letter opinion that the disputed assets constituted personal property and that "[s]uch property was not money received from the sale of a principal asset."[5] The court further explained:

> "The court finds that the assets in dispute are personal-property residuary assets without the requisite connections to define them otherwise, even with reference to the *Oregon Uniform Principal and Income Act*. They, therefore, properly pass to the residuary beneficiary under the Will."

(Italics in original.) Accordingly, the court denied appellants' objections and entered an "Order Approving Final Account [and] General Judgment of Final Distribution," directing that the funds be included in the residue of the estate and distributed to respondent. Appellants appeal that judgment.

On appeal, appellants initially reprise their primary argument below, that is, that the UPIA governs and that, under that statutory scheme, the disputed funds should have been allocated, as principal, to the stipulated testamentary trust. Specifically, appellants contend that the UPIA applies by virtue of ORS 116.007, which provides, in part:

> "(2) *Unless the will otherwise provides, income from the assets of a decedent's estate after the death of the testator and before distribution,* including income from property

---

[5] ORS 129.205 provides, in part, that, as used in the UPIA:

"(4) 'Income' means money or property that a fiduciary receives as current return from a principal asset. The term includes a portion of receipts from a sale, exchange or liquidation of a principal asset, to the extent provided in ORS 129.300 to 129.385.

"* * * * *

"(10) 'Principal' means property held in trust for distribution to a remainder beneficiary when the trust terminates."

used to discharge liabilities, shall be determined in accordance with the rules applicable to a trustee under ORS chapter 129 and this section and distributed as follows[.]"

(Emphasis added.) In appellants' view, the decedent's will does not establish how "postmortem receipts" are to be allocated; therefore, under ORS 116.007(2), distribution is as provided in the UPIA. Respondent remonstrates that, in this case, the decedent's will does, in fact, "otherwise provide" for the distribution of the disputed assets; therefore, resort to the UPIA is improper. In response to that argument, appellants shift focus, arguing in their reply brief that the assets are interests in real property and, therefore, their distribution is "governed by that portion of [the decedent's] *will* that controlled real property," meaning that "the income from those payments are respondent's, for life, with the remainder to appellants." (Emphasis added.)

With the arguments so framed, the first question we must resolve is whether the decedent's will provides for the treatment of "income from the assets of [her] estate after [her] death * * * and before distribution." ORS 116.007(2). We conclude that it does; thus, the UPIA is inapposite.[6]

As noted, paragraph A of the decedent's will devises to respondent for his life, with the remainder to appellants, "[a]ll real property [the decedent] may own at the time of [her] death[.]" It then provides, in paragraph B, that *"[a]ll the*

_____

[6] It appears that the UPIA itself would compel the same result under the terms of the trust. As respondent points out, ORS 129.210 provides, in part:

"(1) In allocating receipts and disbursements to or between principal and income, and with respect to any matter within the scope of ORS 129.250 to 129.280, a fiduciary:

"(a) Shall administer a trust or estate in accordance with the terms of the trust or the will, even if there is a different provision in this chapter."

In this case, the stipulated testamentary trust defines with particularity the trust principal—namely, $1,206,035.27 in net proceeds from the sale of the ranch that had been deposited in specified accounts and a $200,000 trust deed and installment note. In other words, under the terms of the trust itself, trust principal does not include the disputed assets—whether or not they can be said to derive from the sale of the ranch as appellants contend—and the definitions of principal and income in the UPIA are of no import. *Cf. Stipe v. First National Bank*, 208 Or 251, 273-74, 301 P2d 175 (1956) (holding, under a previous version of the UPIA, that, where the trust "did not include a provision directing the manner of ascertaining the principal and income in any way at odds with the provisions of the Uniform Act," the definitions of principal and income found in the act prevailed).

*rest, residue and remainder* of my estate, real, personal or mixed, of which I may die seized or possessed *or to which I may be entitled at the time of my death*, to my husband, [respondent], absolutely and without limitation."[7] (Emphasis added.) Thus, with the exception of real property owned by the decedent at her death, the will directs that *all* the remaining property of her estate, including property to which she was "entitled at the time of [her] death," is to be distributed to respondent. The funds in dispute here—the 2008 crop share, 2008 CRP payments, and forfeited earnest money—are unquestionably property to which the decedent was entitled at the time of her death and which were received after her death and before distribution of her estate. In short, the will "otherwise provides" for the distribution of the assets, ORS 116.007(2), and the UPIA does not apply. Moreover, unless the assets can be considered real property owned by the decedent at the time of her death, they were properly distributed to respondent under paragraph B of the will.

That brings us to the second question: whether, as posited by appellants' alternative argument, the disputed funds—at least the 2008 crop share and CRP payments—are properly characterized as real property owned by the decedent at the time of her death, thus entitling appellants to a remainder interest under paragraph A of the will.[8] Even assuming that appellants properly preserved that argument before the probate court, *see* 248 Or App at 428, 427 n 4 (discussing appellants' arguments below), it is unavailing.

---

[7] " 'Real property,' " for purposes of Oregon probate law, is defined as "all legal and equitable interest in land, in fee and for life." ORS 111.005(28). " 'Personal property' " is "all property other than real property." ORS 111.005(25).

[8] To the extent appellants can be understood to also advance this argument with respect to the forfeited earnest money, we reject it as well. The decedent's entitlement to that money arose out of a contract—specifically, the failed earnest money agreement—not a "legal [or] equitable interest in land." ORS 111.005(28). Moreover, if we were to accept the proposition that the forfeited earnest money constituted the decedent's real property at the time of her death because, as appellants assert, "the decedent's right to this money was inseparable from her general ownership rights" in the ranch, the logical consequence would be that the party who ultimately purchased the ranch would be entitled, not just to the land, but also to the forfeited earnest money from the prior, unsuccessful land transaction. That makes no sense. *See also West v. White*, 307 Or 296, 300, 766 P2d 383 (1988) (noting, in *dicta*, that a promissory note secured by a trust deed on real property was not an interest in real property under the probate code).

We begin with the 2008 crop share. The parties do not dispute that the decedent was the legal owner of the ranch when she died or that the ranch was subject to a valid sales agreement and earnest money receipt that reserved to the decedent the 2008 crop share. Appellants contend that, because "the crops at issue were still attached to the land at the time of the decedent's death," the crops are also real property owned by the decedent at the time of her death, entitling appellants to a remainder interest in the 2008 crop share under paragraph A of the decedent's will. According to appellants, under Oregon case law, "unless there is a *deed* (or some similar instrument[ ] that grants an immediate right to possession) that reserves the vendor's right to the crops, the crops—which are otherwise treated as realty—are conveyed with the land." (Emphasis added.) Thus, in appellants' view, the decedent's reservation of the 2008 crop share in the addendum to the real estate agreement did nothing to constructively sever the crops, and they remained real property until they were physically severed from the property—sometime *after* the decedent's death, by which time a remainder interest had passed to appellants.[9]

Respondent takes issue with that proposition, arguing that the decedent's reservation of the 2008 crop share was sufficient to effectuate a constructive severance of the crops from the land at that time—in other words, without the necessity for reservation in a *deed*—and the crop and its proceeds were therefore properly considered personal property at the time of the decedent's death. Alternatively, respondent argues that, in any event—that is, even if the 2008 crop share is considered to be part of the real property at the time of the decedent's death as appellants argue—respondent, as the life-estate holder of that property under the decedent's will, is entitled to the income from the property, including the 2008 crop share.[10] We agree with the latter argument—that is,

---

[9] Appellants' argument necessarily assumes that disposition of the ranch property is governed by paragraph A of the decedent's will, notwithstanding the real estate agreement and earnest money receipt that was executed—but had not closed—before the decedent's death. The stipulated trust also appears to be based on this assumption.

[10] Respondent's proffered alternative basis for affirmance was raised in the proceedings below; thus, it is appropriate for us to consider it in this case. *See*

even if we accept appellants' premise that disposition of the 2008 crop share is governed by paragraph A of the will because it is part of the real property the decedent owned at her death, the asset was properly distributed to respondent.

Generally, "the owner of an estate for life has the right to receive all issues and profits derived from the land during [the continuance of the estate], except when the creating instrument otherwise provides." Richard R. Powell, 2 *Powell on Real Property* § 15.03[2] (2009) (citing *Restatement (First) of Property* § 119 (1936) ("The owner of a possessory estate for life, during the continuance of such estate has the privilege of taking and receiving all issues and profits derived from the land.")) (footnotes omitted). *See also In re Stout's Estate*, 151 Or 411, 420, 50 P2d 768 (1935) (general rule that life tenant is responsible for making reasonable repairs necessary to preserve property flows from the principle that the tenant "receives all the rents, income and profits growing out of the use of the property during the life of his tenancy" (internal quotation marks omitted)). A life tenant generally has the right to "all the ordinary uses to which the land is accustomed to be put." 2 *Thompson on Real Property* § 19.07 (David A. Thomas ed., 2000). Moreover,

> "[t]he leading rule holds that both crops harvested and those being harvested at the time of death of the owner belong to the life tenant, not to the remainderman. The life tenant is also entitled to the profits resulting from such use."

*Id.* (footnotes omitted).

Here, if we accept appellants' premise that paragraph A of the will governs distribution of the ranch because the decedent still owned it at the time of her death, it follows that a life estate in the ranch passed to respondent at the decedent's death. It further follows, that, under the authorities cited above, respondent, as life tenant, was entitled to

*Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (for an appellate court to affirm on an alternate basis (1) the facts of record must be sufficient to support the alternate basis; (2) the trial court's ruling must be consistent with the view of the evidence under the alterative basis; and (3) the record must materially be the same one that would have been otherwise developed). Respondent also made this argument with respect to the 2008 CRP payments discussed below. 248 Or App at 433.

profits from that property during the life estate, including the 2008 crop share that accrued under the lease.

For the same reason, respondent was entitled to the 2008 CRP payments. The parties dispute whether those payments constitute real or personal property, and they each cite various bankruptcy cases to support their position.[11] Appellants rely primarily on *In re Zweygardt*, 149 BR 673, 678-80 (D Kan 1992), and the cases it cites, contending that they reflect the better reasoning—essentially that,

> "[i]f Congress treats CRP payments as 'rent,' if the payments 'run with the land,' and if the agreement to take the payments turns over to the government the right to partially control the land for a ten-year period, the payments are much more in the nature of a real property interest than a mere contractual right."[12]

Respondent points to other bankruptcy cases, specifically, *In re Isenbart*, 255 BR 62, 65-66 (Bankr D Kan 2000); *In re Harvard*, 209 BR 196, 199-200; (WD La 1997), *aff'd*, 137 F3d 1349 (5th Cir 1998); *In re Koerkenmeier*, 107 BR 195, 197-98 (Bankr WD Mo 1989), reasoning that those cases persuasively illustrate that, under the statutory scheme, "CRP payments are nothing more than payment of monies for services." Thus, in respondent's view, "CRP payments are a contract right, do not run with the land, and the trial court properly classified the CRP payments at issue here as personal property."

The problem with appellants' argument is that, even if they are correct that CRP payments are akin to "rent" under the statutory scheme enacted by Congress, respondent, as life tenant of the ranch under the decedent's will, would be entitled to those payments as profits of the life estate during the life tenancy. *See, e.g., In re Stout's Estate*, 151 Or at 420. Thus, we need not resolve the parties' dispute

---

[11] No reported Oregon decision has addressed this question.

[12] *Zweygardt* references, *inter alia*, various CRP statutes and regulations referring to payments under the program as "rents," the 10-year duration of the CRP payments and obligations, the fact that, if title changes during the term of the contract, the new owner, not the original owner, is entitled to the payments, and the fact that "[e]nrollment in a CRP program clearly limits a farmer's use of the land." 149 BR at 679.

over "real versus personal" property; even if the property is considered an interest in real property, as appellants contend it should be, the trial court did not err in awarding the CRP payments to respondent as the holder of the life estate.

Affirmed.