Argued December 21, 1948; reversed April 12, 1949

## ·In re DANIEL'S ESTATE
## BRACKETT, executrix *v.* U. S. NATIONAL BANK OF PORTLAND

205 P. 2d 167

*Wilber Henderson* argued the cause for appellant. On the brief were Platt, Henderson, Warner, Cram & Dickinson, of Portland.

*James C. Dezendorf* argued the cause for respondent. With him on the brief were Koerner, Young, Swett & McCulloch, all of Portland.

Before Rossman, Chief Justice, and Lusk, Belt, Bailey, Brand and Hay, Justices.

### BAILEY, J.

This is an appeal by The United States National Bank of Portland, as executor of the estate of William N. Daniels, deceased, from an order of the Circuit Court for Multnomah County, Department of Probate, allowing the claim of Constance M. Brackett, executrix of the estate of Ralph L. Brackett, deceased, against the Daniels estate.

William N. Daniels died testate on or about August 1, 1944, and thereafter The United States National Bank of Portland, Oregon, was appointed executor of his estate. On February 17, 1945, Ralph L. Brackett presented to such executor his claim against the estate of William N. Daniels, deceased, for alleged services rendered by him to the deceased, which claim is, omitting the name of the court and cause, as follows:

"State of Oregon ⎫ ss.
  County of Multnomah ⎰

### Proof of Claim

"I, Ralph L. Brackett, being first duly sworn, depose and say, that the Estate of William N. Daniels, also known as W. N. Daniels, deceased, is indebted to me in the sum of Twenty Thousand Dollars ($20,000.00) for services rendered to the deceased in performing the duties set forth in the Power of Attorney dated March 11, 1944, and the amplification thereof dated July 26, 1944, executed by the deceased, copies of which are attached hereto and made a part hereof to the same effect as though set out herein in full, and the sale of the stock owned by the decedent in the Liberty Fuel & Ice Company, a corporation; that there is justly due to me the said sum of Twenty Thousand Dollars ($20,000.00); that no payments have been made thereon, and there are no just counterclaims to my knowledge.

"Ralph L. Brackett

"Subscribed and sworn to before me this 30th day of January, 1945.

[Notarial Seal]

"Andrew Koerner
  Notary Public for Oregon
  My commission expires March 6, 1948."

(Attached to claim)

"KNOW ALL MEN BY THESE PRESENTS: That I, W. N. Daniels, do hereby constitute and appoint Ralph L. Brackett of Portland, Oregon, my attorney in fact to act for me and in my stead and place, to examine the books and records of the Liberty Fuel & Ice Company, a corporation, and all By-Laws and Minutes thereof, and if any questions or controversies come up with reference to the conduct of the business of said company, or between the stockholders thereof, to negotiate settlement of any controversies that might arise with reference to the corporate matters, or between myself and any other stockholder or stockholders, as fully and completely as I might do or cause to be done if personally present and make the examination and adjustments.

"IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of March, 1944.

"W. N. Daniels

"Subscribed and sworn to before me the day and year hereinabove written.

"D. P. Price

"Notary Public for Oregon

My commission expires April 17, 1945."

(Also attached to claim)

"Mr. Ralph L. Brackett, and July 26, 1944.
To Whom it May Concern:
Portland, Oregon.

"It is my desire and I hereby request that in event of any change in my present personal affairs of whatsoever character, kind or nature, the authority vested in Ralph L. Brackett, by virtue of certain Power of Attorney dated March 11, 1944 covering my ownership of stock and other interests in the Liberty Fuel & Ice Company, Portland, Oregon, be continued until all adjustments, claims and disposition of stock comprising my interests in said

Company have been made to the satisfaction and approval of said Ralph L. Brackett, or final adjudication by the Court.

Yours truly,
W. N. Daniels
"Witnesses   D. P. Price"

Thereafter and on the 17th day of February, 1945, The United States National Bank, as executor, endorsed upon the foregoing claim the following:

"Examined and Rejected
2-17-45
"The United States National Bank of Portland
Executor
"By L. B. Staver
Trust Officer"

And on the 24th day of February, 1945, the executor filed such proof of claim with the clerk of the Circuit Court, Multnomah County, Oregon.

Ralph L. Brackett died testate on April 17, 1947, and Constance M. Brackett, his widow, was appointed executrix of his last will and testament. On the 25th day of May, 1947, such executrix filed with The United States National Bank, as executor, the following document designated "Proof of Claim" which, omitting the name of the court and cause, reads as follows:

"State of Oregon    }
County of Multnomah } ss.

Proof of Claim

"I, Constance M. Brackett, being first duly sworn, depose and say that I am the duly appointed and acting Executrix of the Estate of Ralph L. Brackett, deceased; that Ralph L. Brackett, prior to his death, filed a proof of claim in the above entitled Estate in which he asserted that the Estate of

William N. Daniels, also known as W. N. Daniels, deceased, was indebted to him in the sum of $20,-000.00 for services rendered to the said William N. Daniels, deceased (1) in performing the duties set forth in the power of attorney dated March 11, 1944, and the amplification thereof dated July 26, 1944, executed by the deceased, copies of which agreements were attached to and made a part of Ralph L. Brackett's proof of claim, and (2) in connection with the sale of the stock owned by William N. Daniels, deceased, in the Liberty Fuel & Ice Company, a corporation; that there is justly due to me, as Executrix of the Estate of Ralph L. Brackett, deceased, the said sum of $20,000.00; that no payments have been made thereon and there are no just counterclaims to my knowledge.

"Constance M. Brackett

"Subscribed and sworn to before me this 9th day of May, 1947.

[Notarial Seal]

"Andrew Koerner
"Notary Public for Oregon
My commission expires
March 6, 1948."

Thereafter and on the 28th day of May, 1947, the executor endorsed upon such claim the following:

"Examined and Rejected May 28, 1947
"The United States National Bank of Portland
Executor
"By L. B. Staver, Trust Officer"

and on June 5, 1947, filed the same with the clerk of the Circuit Court, Multnomah County, Oregon.

The executor contends in his first assignment of error that the Court "erred in receiving or in admitting any evidence on the claim as presented against the estate over the objection of the executor." His ob-

jection was on the ground that the claim "did not state a cause of action against the estate or show a subsisting liability in favor of the claimant and against the estate". He argues that the claim, considered as one "upon an express contract for the payment of money for alleged services", does not contain or include an allegation: (1) of an agreement or promise to pay $20,000 or any other sum to the claimant; (2) that claimant did or performed any service whatsoever; (3) that "any question or controversy come up" which formed the contingency or condition precedent to the performing of duties referred to in the power of attorney attached to the claim; (4) that claimant did or performed anything in connection with the sale of stock owned by the decedent in the Liberty Fuel & Ice Company.

It is further argued by the executor that the claim, considered as one predicated on the theory of quantum meruit, contains no averment alleging: (1) the extent or amount of services or work performed by the claimant; (2) the reasonableness of the value of the services performed or in any way fixing the value of the services performed; (3) what would be or constitute the reasonable value for the alleged work or services.

In *Sargent v. Foland,* 104 Or. 296, 207 P. 349, Sargent presented to the executor of the estate of Walter Kinnaman a verified claim against the estate for $1,000 for "labor on the Walter Kinnaman ranch near Beaver, Tillamook County, Oregon, for about two years beginning December 1, 1916, and ending December 1, 1918." This claim was rejected by the executor. Thereafter Sargent brought the above-entitled action against the executor to recover the $1,000. During the trial

of the action the Court received as evidence, over the objection of the executor, the verified claim which plaintiff had presented and the executor rejected, and the admission of this verified claim in evidence was assigned as error. In answering defendant's argument the Court observed:

"* * * The statute does not prescribe any particular form for a claim presented against an estate. It is sufficient if the claim and affidavit show a substantial subsisting liability in favor of the claimant and notifies the representative of the estate of the character and amount of the claim. The facts constituting the claim may be asserted in general terms and need not be stated with the particularity required in an action at law: Wilkes v. Cornelius, 21 Or. 348, 350 (28 Pac. 135); Tharp v. Jackson, 85 Or. 78, 85 (165 Pac. 585, 1173); In re Andersen's Estate, 101 Or. 94 (198 Pac. 236, 238); Branch v. Lambert, 103 Or. 423 (205 Pac. 995, 1002)."

See also *Elliott v. Mosgrove,* 162 Or. 507, 91 P. (2d) 852, 93 P. (2d) 1070; In re Stout's Estate, 151 Or. 411, 50 P. (2d) 768, 101 A. L. R. 672.

The defendant in the Sargent case insisted that the verified claim was insufficient because it failed "affirmatively to declare that the services were rendered pursuant to an express promise by the decedent to pay for them." The Court disposed of this contention by stating: "Indeed, the verified claim is based, so far as it appears on its face, upon an implied promise inferred by the law."

In his proof of claim Brackett stated that the Estate of William N. Daniels, deceased, "is indebted to me in the sum of Twenty Thousand Dollars ($20,000.00) for services rendered to the deceased in performing the

duties set forth in the Power of Attorney dated March 11, 1944, and the amplification thereof dated July 26, 1944, * * * and the sale of the stock owned by the decedent in the Liberty Fuel & Ice Company, a corporation; that there is justly due to me the said sum of Twenty Thousand Dollars * * *; that no payments have been made thereon, and there are no just counterclaims to my knowledge." We think that Brackett's claim shows "a substantial subsisting liability in favor of the claimant" and notifies the executor of the estate of the character and amount of the claim. It contains a sufficient statement of Brackett's claim and meets the requirements of §§ 19-703 and 19-704, O. C. L. A. Moreover, the executor apparently did not reject the claim because of the insufficiency of the statement. In *Aiken v. Coolidge,* 12 Or. 244, 6 P. 712, the court said:

> "* * * The ordinary mode in making out claims against the estate of a deceased party is to state an account, and then verify it. In this case the claim was included in a general affidavit. The respondent deposed to the fact that the estate was indebted to her in the amount; that there were no legal set-offs or counterclaims existing against it; that no payment had been made thereon, and that the amount was due her. This is the substance of the statutory requirements. Besides, the appellants ought not to be permitted to complain upon that ground. They rejected the claim generally. Their refusal to allow it should have been for the special reason that it was not formally made out, otherwise they should be deemed to have waived the objection." See also in this connection Anno., 74 A. L. R. 381.

No error was committed by the Court in receiving evidence of the claim.

The ground of the executor's second assignment of error is that the Court erred "in not requiring the claimant to elect upon which theory he was proceeding, i.e., on an express contract or on the theory of quantum meruit." At the beginning of the trial counsel for the executor moved the Court "to require the claimant to define his position, as to whether he is asserting his claim on the theory of a contract, or on the theory of reasonable value. I think I am entitled to have that defined at this time, and I move the court to require claimant to do that."

■ On the authority of *Paget v. Cordes,* 129 Or. 224, 277 P. 101; *State v. Montag Co.,* 132 Or. 587, 286 P. 995; *Smith v. Williams,* 180 Or. 626, 178 P. (2d) 710, 173 A. L. R. 1220, and 41 Am. Jur., Pleading, § 106, p. 363, we hold that the Circuit Court did not err in refusing to require the claimant to elect, at the beginning of the presentation of her case, whether she would proceed on the theory of an express contract or on the theory of reasonable value.

The executor's third assignment of error reads as follows:

"The court erred in receiving over the objection of the appellant Exhibits 6, 7, 8, 9 and 10. Exhibits 7, 8, 9 and 10 were offered in support of Exhibit 6. Exhibit 6 was represented to be in the handwriting of Ralph L. Brackett. No showing was made that Exhibit 6 was made at or near the time the transaction it purports to relate to, occurred or transpired, nor was there any showing that it was made in the regular course of business. These Exhibits were incompetent, irrelevant and immaterial, and they did not tend to support or prove any issue in the case."

Exhibit 6 is a sheet of Mrs. Ralph L. Brackett's

personal stationery on which appears, in the handwriting of Mr. Brackett, the following:

"March 30, 1944

"W. N. Daniels—Services & Commission of 50% on $3337.77 Collected for W. N. Daniels from Liberty Fuel & Ice Co.:—

"Represented by L. F. & I. Co's checks dated March 29 favor W. N. D. as follows:—
"#36241—$1537.77  #36242—1800.00
(Aug. 31, '36)
"paid R. L. B. 1668.88"

After Mrs. Brackett stated that she had procured the document from Mr. Brackett's files it was offered in evidence, to the introduction of which counsel for the executor made the following objection:

"If the court please, I object to this as incompetent, irrelevant and immaterial. We might as well bring in a letter that this man wrote before he died, any kind of a statement that he might have written before he died and have it received in evidence and it would be just as competent as this. This is something that she says is in his handwriting: that doesn't make it fit to prove any fact in this case. Assuming it is his handwriting, supposing he had written out a letter or memorandum—supposing he had written out a memo here saying 'Mr. Daniels owes me $40,000, because of so and so and so and so': that is not evidence, and this is not evidence, if the court please, and I object to it as incompetent, irrelevant and immaterial, not tending to prove any issue of fact, and not properly established."

Neither the custodian of the document nor any "other qualified witness" testified "to its identity and the mode of its preparation" or that it was "made in the regular course of business at or near the time of the act, condition or event" as required by chapter

414, Oregon Laws 1941, to make it admissible in evidence as a business record.

The executor's objection to the admission of this document in evidence was on the ground that it was "incompetent, irrelevant and immaterial, not tending to prove any issue of fact, and not properly established." In stating his objections to the admission of this exhibit, counsel for the executor attempted to explain what he meant by labeling it incompetent. He compared it with any kind of statement, letter or memorandum which Brackett might have written before his death. Implicit in his objection to its admission is the objection that there was no showing that it was made at or near the time the transaction, to which it relates, occurred or that it was made in the regular course of business; in other words, that it was not admissible under the provisions of chapter 414, Oregon Laws 1941.

In our opinion the Court erred in admitting in evidence exhibit 6. It does not follow, however, that such error requires a reversal of the judgment. This proceeding is considered as an action at law and was tried by the Court without a jury. It is pointed out in *Menefee v. Blitz,* 181 Or. 100, 131, 179 P. (2d) 550, "that in actions tried without a jury it will presume, in the absence of indications to the contrary, that the trial judge, in reaching his findings, disregarded incompetent evidence which he erroneously admitted, and that he based his findings upon the properly admitted evidence." The Court quotes with approval from 3 Am. Jur., Appeal and Error, § 940, p. 504, as follows:

"* * * This presumption [that the incompetent evidence was disregarded], however, loses

its force when it reasonably appears from an inspection of the record that the incompetent testimony did influence in some degree the action of the trial court in rendering the particular judgment."

After considering the entire record we shall be able to ascertain whether the trial court was influenced in its decision by the consideration of this exhibit.

It is also contended under the third assignment of error that error was committed in admitting in evidence exhibits 7, 8, 9 and 10. Exhibit 7 is a receipt issued by The First National Bank of Portland showing a deposit on March 30, 1944, of $1,668.88. Exhibit 8 is a statement of the main branch of The First National Bank of Portland of the account of Ralph L. Brackett or Constance M. Brackett for the month of March, 1944, showing, among other deposits, one for $1,668.88. Exhibit 9 is a photostatic copy of a check dated March 29, 1944, for $1,537.77, payable to W. N. Daniels, signed by the Liberty Fuel & Ice Company, and exhibit 10 is a photostatic copy of a check of the same date for $1,800, with the same payee and payor. One-half of the total of the two checks is $1,668.88. Each of these exhibits was objected to by the executor on the ground that it was immaterial, irrelevant and incompetent as it did not tend to prove any issue in the case. We shall defer passing upon the admissibility of these exhibits until we have discussed the evidence in the case.

The fourth assignment of error reads as follows:

"The court erred in awarding a judgment in favor of the claimant and against the estate for the reason that there was no competent evidence offered or received supporting a judgment on either:

"(a) The theory of an express contract or

"(b) The theory of quantum meruit for $20,-000.00 or any other sum."

The claimant, in her brief, states that "we do not now contend that the record will support a claim based upon the first theory above mentioned [an express contract]", and "in our argument in the trial court, after the close of the evidence, we indicated that we were placing principal reliance on the quantum meruit theory." Therefore we shall assume that if claimant is entitled to recover it must be on the theory of quantum meruit and not on the theory of an express contract.

The Court awarded the claimant judgment against the estate in the sum of $20,000. This amount was one-half of the $40,000 which the executor received from the sale to A. G. Riddell of decedent's shares of stock in the Liberty Fuel & Ice Company.

Some time prior to 1907 A. G. Riddell, W. N. Daniels and R. E. Phillips organized the Liberty Coal & Ice Company, each owning an equal number of the shares of stock therein. On or about May 4, 1907, Riddell and Daniels purchased all of Phillips's shares of stock in said corporation and from that time until the death of Daniels each owned one-half of the capital stock. The name of the corporation was changed on or about August 1, 1936, to Liberty Fuel & Ice Company. About the month of July, 1936, Riddell and Daniels were unable to agree upon the policies of the corporation and it was stipulated between them that one of them should issue one share of stock to Paul C. Harbaugh, who was employed by the corporation as a bookkeeper, in order that he might qualify as a director, and thereupon Daniels, without consideration, caused to be issued one of his shares of stock to Harbaugh. Thereafter, and

in August, 1936, Harbaugh, pursuant to the previous understanding between Riddell and Daniels, was elected a director of the corporation.

It is asserted by the claimant that Brackett assisted Daniels in working out the deadlock which existed in 1936 between Riddell and Daniels in the operation of the Liberty Fuel & Ice Company. The evidence is very meager as to any assistance which Brackett may have given Daniels in 1936. However, later he did assist Daniels in the latter's troubles with Riddell. Brackett and Daniels were brothers-in-law, their wives being sisters. In 1936 Brackett retired as sales manager of the Crown Willamette Company. Previously thereto he had owned the Crescent Paper Company. In 1936, and until his death, Daniels was active in businesses other than that of the Liberty Fuel & Ice Company.

During the month of May, 1942, Harbaugh attempted to buy Daniels's stock in the Liberty Fuel & Ice Company but he and Daniels were unable to agree upon the terms and conditions of the sale, and on or about June 1, 1942, negotiations for the sale were terminated. Thereafter, according to the allegations of a complaint, in which Daniels was plaintiff and Riddell, Harbaugh and the Liberty Fuel & Ice Company were defendants, which was filed in the Circuit Court for Multnomah County on June 8, 1944, Riddell and Harbaugh "conspired and collaborated together in a manner and for the purpose of depriving plaintiff of any income from his investment in stock in said company or as an officer thereof, and by systematic planning and scheming together and misrepresentation to plaintiff herein," caused the salaries of the officers of the corporation to be eliminated and caused the said Riddell and Harbaugh to be elected managers of the

corporation at greatly increased salaries and caused to be distributed to each of them, Riddell and Harbaugh, large bonuses.

Daniels was dissatisfied with what had been done by Riddell and Harbaugh and consulted his attorney, D. P. Price. Mr. Price had been his attorney for many years and also was Brackett's attorney. As a witness for the claimant Price testified concerning the matter as follows:

"Q. What, if anything, did Mr. Daniels do with respect to hiring you to try to work out the situation in which he found himself as a result of that meeting of June 9th, 1942? * * * A. Well, Mr. Daniels had spoken to me a time or two about the meeting and what happened—that is, after the meeting—and was very much dissatisfied with the same, but did not authorize me to take any kind of action, or I don't recall that he asked me for an opinion on it at that time.

"Q. Is it your statement that he did not ask you what, if anything, he could do as a result of that? A. I do not recall of his doing so at that time.

"Q. All right; did he ever? A. Through Mr. Brackett, yes; and then after we started in, Mr. Brackett and Mr. Daniels both sat in conferences on different matters, in discussing different things and his version of the affair.

"Q. All right; did Mr. Brackett and Mr. Daniels come in to see you on or about the 11th of March, 1944? A. I am not so sure whether Mr. Daniels was with Mr. Brackett at that time. Mr. Brackett came in at that time."

On or before March 11, 1944, a resolution was passed by the stockholders or directors of the Liberty Fuel &

Ice Company, without Daniels's knowledge, authorizing the sale of some or all of the unissued stock of the corporation. A copy of this resolution was brought into Price's office by Brackett. After consulting with Daniels and Brackett, Price pointed out to them that in order for Daniels to preserve his rights as owner of one-half of the stock in the corporation he, Daniels, should be given the right to purchase one-half of the then unissued stock when offered for sale, and on March 11, 1944, as attorney for Daniels, Price wrote a letter to the corporation demanding that Mr. Daniels be given that right. This letter was delivered to the corporation by Brackett.

On the same day the power of attorney, a copy of which is attached to Brackett's claim, was prepared by Price and signed by Daniels. In explanation of the reason for giving this power of attorney to Brackett we have the following testimony of Mr. Price, as a witness for claimant:

"Q. You drew a power of attorney for Mr. Daniels to Mr. Brackett? A. Yes, I did.

"Q. Did Mr. Daniels tell you why he was doing that, or what the occasion was? A. I might have told Mr. Daniels why he was doing it; I don't know.

"Q. You haven't any recollection at all of the circumstances under which that power of attorney was drawn? A. Most certainly I have.

"Q. What were they? That's all I'm trying to find out. A. Here was a question came up with reference to this first—the first minutes of the meeting in June, in 1942, I believe it was—I don't recall exactly—and they wanted to see if there wasn't something could be done about it; and also, in the meantime, they had made arrangements to change the offices from the east side over to the

west side, and Mr. Daniels claimed that he hadn't known anything about that; so I says to him 'Well, you better make some arrangements to go down there and examine the books of the Liberty Fuel & Ice Company and see what is happening, see what resolutions they have made with reference to leases, and so forth,' and that's the way it came about. Well, of course, Mr. Daniels didn't want to go down and go through the books; his handwriting—he couldn't write very well, so I suggested that he give a power of attorney, and that they would recognize a power of attorney to someone to go down and examine the books, and that's how we happened to draw up that power of attorney authorizing Mr. Brackett to examine the books of the Liberty Fuel & Ice Company."

Mrs. Constance M. Brackett, widow of Ralph L. Brackett and executrix of his estate, gave the following testimony:

"Q. Please answer this question 'Yes' or 'No': was there, to your knowledge, any oral agreement between Mr. Daniels and Mr. Brackett concerning the amount he would receive for representing Mr. Daniels in connection with the Liberty Fuel & Ice Company matter? Answer 'Yes' or 'No'. A. Yes.

"Q. What is the basis of your knowledge of the contract? Was it made in your presence? A. Through the telephone.

"Q. And who was on the telephone on either end? A. Mr. William Daniels was on one end of the phone, and Mr. Brackett was on the other, and I was downstairs on the other end of the phone: we have an extension phone.

"Q. Were you and Mr. Brackett in your home? A. Absolutely, yes.

"Q. Mr. Daniels was on the other end of the telephone. A. Yes.

"Q. Do you know approximately when that

conversation or agreement took place? A. Well, I don't remember—

* * * * *

"Q. Do you know about when it took place? A. I would say the latter part of February to the middle of March; I don't remember exactly.

"Q. What year? A. 1944.

* * * * *

"Q. Now, there perhaps will be an objection, so you had better wait until the matter is disposed of: what was the conversation between Mr. Brackett and Mr. Daniels that you heard? * * * A. Mr. Daniels asked Mr. Brackett if he would take charge of the affairs of the Liberty Fuel & Ice Company, and that is the only question that I understood they had between them: the affairs of the Liberty Fuel & Ice Company; and he said 'Ralph, if you'll do it, I'll give you half of everything you collect from the Liberty Fuel & Ice Company;' and then I went upstairs and hung up the phone."

Mrs. Bessie M. Daniels, widow of William N. Daniels, deceased, swore that she heard the conversation concerning which Mrs. Brackett testified. Her testimony is as follows:

"Q. You were in the court room yesterday and heard Mrs. Brackett's testimony? A. Yes; I was.

"Q. You have heard her relate the telephone conversation between your husband, Mr. Daniels, and Mr. Brackett, in the latter part of February or March, 1944? A. I did.

"Q. Please answer these questions yes or no as I give them to you, now. Did you hear any part of the telephone conversation she related? A. Yes.

"Q. Where were you? A. I was in the home and sat in the room and heard Mr. Daniels talk to Mr. Brackett. I heard the entire conversation.

* * * * *

"Q. Would you relate the conversation? A. Yes, Mr. Daniels called Mr. Brackett by phone and told Mr. Brackett anything in connection with the Liberty Fuel & Ice Company he was in should be fifty-fifty and he should have fifty-fifty of what they take in and Mr. Brackett was interceding and Mr. Daniels made the remark he didn't know how he could get along without Mr. Brackett. * * *"

Mr. Price testified that the question whether the suit should be brought by Daniels against Riddell and others "was discussed back and forth between Mr. Brackett and Mr. Daniels and myself after we had —after they had collected the facts and brought them to me; and it was my opinion that there was sufficient facts to justify a suit in equity for certain relief, and they agreed to that—that the only way to get it was to bring suit." In the suit which was brought demand was made that Riddell and Harbaugh pay back into the treasury of the corporation certain amounts of money that had been drawn by them through salaries and bonuses. No judgment was demanded in favor of Daniels.

Counsel for claimant attempted to get Price to state that the objective of the suit was to force the sale of Daniels's capital stock in the Liberty Fuel & Ice Company. Relative to that matter we quote the following testimony:

"Q. Did Mr. Daniels at any time tell you after this suit was brought, or immediately before it was brought, that he was interested in selling his stock in the Liberty Fuel and Ice Company? A. I don't think he did, outside of this here—and he wasn't placing it on the market anyway. I don't recall him telling me that he did want to sell it.

"Q. Did Mr. Brackett say anything to you indicating that his purpose in prosecuting this action

was to effect an advantageous sale of Mr. Daniels' stock? A. No.

"Q. That was not considered by you in any way? A. No."

It was stated by Price that the theory of the case brought by Daniels against Riddell and others was his own, that he did not consider that Brackett "furnished any of the theory of the legal questions", and that Brackett did nothing except to furnish copies of the corporate records and data from the books of the corporation. On cross-examination Price testified as follows:

"Q. Mr. Price, other than conversations carried on with you by Mr. Brackett, did Mr. Brackett do anything in connection with this claim that you know of, other than to go down to the Liberty Fuel & Ice Company and copy some minutes and make some copies of records out of the books? *. * *. A. As far as I know, that is practically the extent of it, and reporting to me.

"Q. Yes. Now, this work in copying the minutes and bringing the data from the records, was that anything that could not have been done by your secretary or stenographer? A. I would say that the mere copying of the records could be done by anyone that was capable of reading and writing."

Mr. Price further testified that "the question of the compensation as between Mr. Daniels and Mr. Brackett was not discussed" with him and it was not mentioned in his presence; and that Brackett never indicated to him that he "expected compensation or pay in any way for what he was doing in the way of taking up" Price's time.

The probate court allowed Price $1,250 for his services in connection with the above mentioned lawsuit.

Mr. LeRoy B. Staver, trust officer of the United States National Bank, was put in charge of the administration of the Daniels's estate. He discussed with Brackett, in a general way, three or four times the Liberty Fuel & Ice Company situation. Brackett told him that the suit was not being prosecuted and that he thought it should be. We quote his testimony:

"Q. Didn't he tell you, Mr. Staver, the best way of bargaining the sale of the stock was to prosecute the suit as vigorously as possible with the idea of winding the whole thing up in the sale of the stock to the defendants? A. I don't think he did. I don't think he expected that stock to be sold.

"Q. Did he tell you that? A. Yes; I—after I started keeping records I have two statements at his suggestion that the stock should not be sold unless Mr. Riddell should put up his own stock and Mr. Brackett said he thought the money would be forthcoming to buy them out.

"Q. You have mentioned the fact that Mr. Brackett told you any dealing should be had on a buy or sell basis? A. That's right.

"Q. Didn't he ask you to do that to get a higher offer out of the defendants, in other words they would be put in a position that any offer made they would have to buy or sell at that price? A. That might have been in the back of his mind but I don't think he thought the stock should be sold."

The case was set down for trial November 1, 1944. The first offer from Riddell to purchase the Daniels's stock was made early in September. Riddell and Harbaugh told Staver that they had been negotiating with Daniels for the purchase of his stock and were willing to resume negotiations at the point where they left off. On November 1st they offered him $25,000. Their offer contemplated, besides the transfer of the Daniels's stock to them, the dismissal of the suit with

prejudice. This offer was communicated by Staver on November 8th to Brackett, who advised against accepting it and suggested proceeding with the suit. On November 21st an offer was received by Staver from Riddell for $35,000 which also included, in addition to the transfer of the stock, the dismissal of the suit. This offer was also communicated to Brackett and his position in relation to the acceptance of this offer is told by Staver as follows:

"Q. What did he say about the $35,000 offer when you discussed it with him? A. He refused to commit himself.

"Q. He told you it wasn't enough, didn't he? A. No, sir.

"Q. Why did he refuse to commit himself? Did he explain, why? A. Yes. We did not ask Mr. Brackett's approval for anything we did but because he was Mrs. Daniels' brother-in-law and volunteered interest in the matter we felt it a courtesy to keep him advised. I advised him of the $35,000 offer and asked for his reaction and he countered with the question: 'Do you recognize the power of attorney.' I told him we could not recognize it and his exact words were, he refused to stick his neck out.

"Q. Did he ever tell you $35,000 was not enough? A. He never talked to me again after that conversation.

"Q. Did you talk to him again? A. No.

"Q. You didn't tell him about the $40,000 offer? A. No, sir.

"Q. You closed the transaction without informing him in any way? A. Yes.

"Q. Tell us briefly about the final offer and from whom it was procured? A. The final offer, $40,000 cash from Mr. Riddell.

"Q. Did it include anything else than transfer of the stock? A. And dismissal of the law suit.

"Q. With prejudice? A. Yes, sir."

The offer for $40,000 was made on November 30, 1944, and the transaction closed December 12, 1944, and the suit dismissed with prejudice on December 13. Staver did not think that Brackett assisted in any way in the sale of the stock. Concerning this matter he gave the following testimony:

"Q. Did Mr. Brackett contribute anything, anything at all to you in the way of information, in the way of advice, that would in any way benefit you in connection with your negotiations with the Liberty Ice & Fuel Company? A. No; I don't think he did.

"Q. Anything you did in connection with the Liberty Fuel & Ice Company you would not have done if he never had talked to you about it? A. Not as far as I could think.

"Q. His talking didn't influence your course of conduct or influence you in any way? A. It didn't influence our course of conduct, I am sure of that.  *   *   *"

Mr. Staver was asked if it was not a fact that the pendency of the suit was "the vital factor in the amount finally received for the Daniels' stock" to which he answered in the negative, and that he did not think it had anything to do with it. We quote further from his testimony in this regard:

"Q. Is it your statement you think you could have gotten the $40,000 for that stock if the suit had not been brought to protect Mr. Daniels' estate? A. That involves so many hypothetical problems it is hard to answer. If the law suit had never been brought it is entirely possible, in my opinion, the stock should have been worth just as much as Mr. Riddell paid for it.

"Q. Are you talking theoretically or actually? A. I don't want to get into any argument but the law suit did not procure any more money for the corporation. The corporation was not worth any

more money after the law suit was filed than before.''

Mr. Staver testified that Brackett ''spent considerable more time with us'' ''on behalf of Mrs. Bessie Daniels in connection with various aspects of this estate'' than he did on the matter of the Liberty Fuel & Ice Company.

.We think that the foregoing statement presents substantially all the material evidence in the record bearing on the fourth assignment of error, which is based upon the alleged insufficiency of the evidence to support the judgment.

Mr. Daniels died on August 1, 1944. His stock in the Liberty Fuel & Ice Company was sold by the executor of his estate on December 12, 1944. Brackett presented his claim against the estate on February 17, 1945, and on the same day it was examined and rejected by the executor. He died on April 17, 1947. There is no explanation why his claim had not been presented to the probate court for allowance prior to his death. Because of the deaths of Daniels and Brackett, evidence of the understanding between them is very meager. Only four witnesses testified. Their testimony has been referred to, and much of it quoted.

In referring to the assistance which Brackett rendered Daniels, counsel for the claimant, in their brief, say:

''Before Mr. Daniels called on Mr. Brackett for assistance, he had been offered $18,000.00 for his half interest in Liberty Fuel & Ice Company by Harbaugh, one of the other stockholders. By reason of Mr. Brackett's investigation and the filing of the suit, appellant sold the stock after Mr. Daniels' death for $40,000.00, conditioned upon dismissal with prejudice of the suit.

"All the work which Mr. Brackett did for Mr. Daniels—which resulted in the advantageous sale of the Daniels' stock—was done prior to Mr. Daniels' death. All that remained to be done was to strike the figure at which the Daniels' stock should be sold or to try the lawsuit."

The executrix of Brackett's estate presented her claim to the probate court for, and was allowed, $20,000, being one-half of what was realized by Daniels's estate from the sale of the stock, for Brackett's services. When one considers that Daniels's attorney was allowed $1,250 by the probate court for his services in connection with the suit referred to in the above quoted excerpt, and that several months' negotiations were carried on by the executor of Daniels's estate before the stock was sold—and for which services the estate will undoubtedly be charged—it is difficult to see how Daniels or his estate profited in the least by the services rendered by Brackett if the judgment appealed from is affirmed. Daniels would have fared better had he accepted the $18,000 offer. Riddell first offered the executor $25,000 for the stock, and had this offer been accepted Brackett, according to claimant's theory, would have been entitled to one-half thereof.

In our opinion the evidence does not support any of the statements made in the above quoted excerpt except the one concerning the offer of $18,000.

■ It is well established in this state that, in an action to recover the reasonable value of services performed, evidence of an express contract fixing the price for such services is admissible in evidence. *Toy v. Gong*, 87 Or. 454, 170 P. 936, and authorities therein cited. Based upon the foregoing rule claimant here asserts that she is seeking to recover the reasonable value of

services rendered by Brackett to Daniels and refers to the alleged agreement between Daniels and Brackett as testified to by Mrs. Brackett and Mrs. Daniels as evidence of the reasonable value of such services. We have already quoted all of their testimony relating to the alleged understanding between Daniels and Brackett but shall again briefly quote a part of Mrs. Brackett's testimony. Concerning the agreement she testified as follows: "Mr. Daniels asked Mr. Brackett if he *would take charge of the affairs of the Liberty Fuel & Ice Company,* and that is the only question that I understood they had between them: the affairs of the Liberty Fuel & Ice Company; and he said *'Ralph, if you'll do it, I'll give you half of everything you collect from the Liberty Fuel & Ice Company;'* * * *" (Emphasis supplied.) Mrs. Daniels heard the same telephone conversation and her testimony is substantially the same.

■ Nothing is said in Mrs. Brackett's testimony concerning the sale of Daniels's stock. What Mr. Daniels agreed to pay his brother-in-law, Brackett, was "half of everything you collect from the Liberty Fuel & Ice Company". As confirmatory of the alleged unilateral contract on the part of Daniels—there is no evidence that Brackett agreed to do anything—the claimant refers to exhibits 6 to 10 inclusive, which are discussed under the executor's third assignment of error. Exhibit 6 need not be further considered since we have held it was erroneously admitted. Exhibits 9 and 10 are two checks from the Liberty Fuel & Ice Company to Daniels, both dated March 29, 1944, one for the sum of $1,537.77 and the other for $1,800, totaling $3,337.77. Exhibit 7 shows a deposit of $1,668.88 on March 30, 1944, without stating the name of the depositor, and

exhibit 8 shows a deposit of the same amount to the account of Ralph L. Brackett or Constance M. Brackett on March 31, 1944. The amount deposited to the credit of the Bracketts was one-half of the total of the two checks and was made some time subsequently to the time of the alleged agreement between Brackett and Daniels. Exhibits 7 to 10, inclusive, may tend to support the testimony of Mrs. Brackett and Mrs. Daniels that there was an understanding between Daniels and Brackett that Brackett was to have one-half of everything he collected from the Liberty Fuel & Ice Company. Possibly it might be inferred, from the fact that Daniels paid Brackett one-half of what he received from the company, that Brackett was instrumental in procuring the payments represented by the two checks. But these exhibits do not, when considered alone or in connection with the testimony of Mrs. Brackett and Mrs. Daniels and the other evidence in the record, tend in any way to prove that Brackett was entitled to any part of the money received by Daniels or his estate from the sale of Daniels's stock. In view of the fact that they may throw some light on the testimony of Mrs. Brackett and Mrs. Daniels, we do not think that the court erred in admitting them in evidence.

■ Much reliance is placed by claimant upon the power of attorney given by Daniels to Brackett, dated March 11, 1944, and the letter from Daniels to Brackett, dated July 26, 1944, copies of which power of attorney and letter are attached to the proof of claim hereinbefore set forth. The letter of July 26, 1944, was signed only four or five days before Daniel's death and nothing appears to have been done by Brackett during that time. Nothing of any consequence was done by Brackett concerning the corporation or the sale of the stock

after Daniels's death. As a matter of fact, upon Daniels's death, any power or authority conferred on Brackett by the power of attorney and the letter of July 26, 1944, came to an end. It is not, as we understand it, contended otherwise by claimant.

■■ We are here considering an appeal from a judgment allowing a claim against an estate. Such judgment has the force and effect of a verdict and "our sole function is to determine whether or not there is any competent, substantial evidence in the record supporting" the judgment. *In re Swank's Estate,* 163 Or. 367, 371, 97 P. (2d) 723, and authorities therein cited. No findings were made in this case and none was necessary. *In re Stout's Estate,* 151 Or. 411, 50 P. (2d) 768, 101 A. L. R. 672.

■■ After a careful examination of the entire record we are of the opinion that the judgment appealed from is not supported by competent, substantial evidence. We are also of the opinion that the Circuit Court, in reaching its decision, was influenced in some degree by exhibit 6, and that the admission of that exhibit was prejudicial to the rights of the executor of the estate. However, the judgment appealed from will not be reversed on that ground but on the ground that the evidence is insufficient to support it.

The judgment appealed from is reversed and the cause remanded to the Circuit Court with instructions to set it aside and disallow the claim.

Hay, J., did not participate in this decision.