Motion to dismiss appeal denied February 7; argued March 22,
affirmed April 25, 1950

IN RE ESTATE OF T. A. STOLL, DECEASED
SMITH *v. LITTLE*, EXECUTOR
214 P. (2d) 345
217 P. (2d) 595

684

*Neal R. Crounse,* of Portland, for the motion.
*Carl M. Little,* of Portland, *contra.*

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN, BAILEY, HAY and LATOURETTE, Justices.

LUSK, C. J.

This is a motion by the respondent to dismiss an appeal. The proceeding was one to establish a claim against a decedent's estate in the Circuit Court (Probate Department) for Multnomah County. There was a summary hearing, at the conclusion of which the court entered an order approving the claim, and the executor appealed. Respondent says that the order is not appealable and that the case is controlled by *In re Wells' Estate,* 187 Or. 462, 212 P. (2d) 729, in which we held that the right to appeal from a sum-

mary determination by that court of a claim against an estate had been abolished by the provisions of Ch. 477 and Ch. 530, Oregon Laws 1949, and that since the effective date of those statutes the only appealable orders in that class of cases are those made at the conclusion of the trial of a plenary action upon the claim. The statutes referred to became effective July 16, 1949. In the Wells case the hearing was had August 29, 1949, and the order allowing the claim was entered August 31, 1949. It was a summary hearing. We held that the statutes applied to pending cases and dismissed the appeal for want of jurisdiction. We did not hold (for the question was not before us) that they applied to cases which had been heard and determined and over which this court had acquired jurisdiction by appeal before the effective date of the new legislation. In this case the order allowing the claim was entered February 7, 1949, and jurisdiction of the cause acquired by this court by service and filing of notice of appeal (Ch. 119, § 2, Oregon Laws, 1943) on April 6, 1949, more than three months before the effective date of the new enactments.

We are of the opinion that the legislature did not intend that the new provisions should be applied to a case of this kind, and that the Wells case is not controlling. While it is well established that a statute taking away jurisdiction should be construed to apply to pending cases, it is entirely clear that there was no general legislative intent to abolish appeals to this court in this class of cases. The expressed intent was to continue in force the right of appeal, but to limit it to those cases where there had been a plenary trial of the claim. Such a trial could be had in the first

instance at the demand of either party, or, if there had been a summary proceeding in the first instance, then, in order to lay the basis for the right of appeal, the aggrieved party might cause the case to be tried anew as an action at law by filing a demand for such a trial within thirty days after the entry of the order of allowance or rejection upon the summary hearing. In the present case the latter procedure could not have been followed for there was no legislation in effect authorizing it while the case was pending in the Circuit Court. The two statutes in question are to be considered as parts of one enactment. When construed together, as they should be, they can only mean that the provision abolishing the right of appeal from a summary determination should be applied in those cases only in which it was possible for the parties to avail themselves of the right to demand a plenary action after there had been a summary determination. To construe the statute otherwise would be to impute to the legislature the intention to leave a class of cases (of which this would be one) involving claims against an estate, in which there would be no right of appeal whatever. This is a result which, we think, was never contemplated.

So to hold is not inconsistent with *Libby v. Southern Pacific Company,* 109 Or. 449, 219 P. 604, 220 P. 1017. That case announces the general rule that the repeal of a law conferring jurisdiction takes away all right to proceed in actions or other proceedings pending at the time of the repeal. Applying that rule, the court dismissed the appeal because the amount involved was less than the jurisdictional amount prescribed by the repealing statute. It did this notwithstanding the fact that judgment had been entered in

the Circuit Court before the repealing act became effective and all essential procedural steps for conferring jurisdiction on this court had been taken before the motion to dismiss was determined. The case differs from this one in two particulars: First, here this court acquired jurisdiction of the appeal before the repealing act was passed; and, second, and more important, the repealing act in the Libby case abolished the right to appeal in all cases where the amount in controversy did not exceed $250.00, whereas we are dealing in this case with legislation which was intended to preserve the right of appeal in cases involving claims against an estate, while regulating the procedure in the probate court which must be followed by a party in order to avail himself of that right. It seems to us that it would be most unreasonable to hold that the legislature intended that these statutes should apply to a case, such as this, where that procedure could not be followed.

The motion to dismiss is denied.

---

ON THE MERITS

*Carl M. Little,* of Portland, argued the cause and filed a brief in pro. per.

*Neal R. Crounse,* of Portland, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, BAILEY, HAY and LATOURETTE, Justices.

HAY, J.

T. A. Stoll died testate September 18, 1947. His will was admitted to probate in Multnomah County on October 6, 1947, and Mr. Carl M. Little was appointed executor thereof. On April 29, 1948, Mrs. Edna Smith filed with the executor a claim against decedent's estate in the sum of $2,250, for special nursing services, and care of decedent's business affairs, for the period from March 15, 1945, to September 18, 1947. The executor rejected the claim. Thereafter, a summary hearing was had thereon by the Circuit Court for Multnomah County, Department of Probate (section 19-704, O. C. L. A.), and the claim was allowed in full by judgment dated February 7, 1949. The executor moved for a new trial, which was denied, and he appealed from the judgment. He assigns error as follows: (1) Lack of competent satisfactory evidence to support a contract, express or implied, to pay for claimant's services, or to sustain an action in *quantum meruit* therefor; (2) lack of competent satisfactory evidence other than the testimony of the plaintiff to support the judgment; (3) denial of the motion for a new trial.

The claimant testified as follows: She was not related to Mr. Stoll. He rented a room at her place

from January 1, 1943, until sometime in March, 1945, for which he paid her $15 a month. Thereafter, he roomed and boarded with her, paying $50 a month for about a year, then $60 a month, and, for the last few months of his life, $65 a month. He died September 18, 1947. He had been in business as a grocer, but retired, owing to ill health, in 1943. From March 15, 1945, until his death, he was often ill, and claimant took care of him, spending many nights looking after him. He was confined to his bed "lots of the time". She conveyed him to the hospital in her own car on different occasions. She is not a nurse, but she did everything for Mr. Stoll that the doctor told her to do. He was at times very sick, and she gave him everything she could to settle his stomach. He vomited "all over the place". She gave him enemas. At his request, she received payment of bills due him in connection with his former grocery business, payments from persons to whom he had loaned money, and monthly rentals of two houses which he owned. She visited him daily when he was in the hospital (on one occasion he was hospitalized for six weeks, on others, for a few days at a time, and sometimes only over night), taking his mail to him there, and receiving his written instructions regarding business matters. She took care of his hospital bills. She reported to him all collections which she made for him, and either paid him the moneys or deposited them in his bank account. He paid her nothing for these services. He told her, on many occasions: "If anything unforeseen happens, you have been well provided for." He said that she was to be paid; that there was money for her. He never said how he was going to pay her, or how much. He purchased a house on Stark Street, and told her that he was going to give it to her. He also told her

that there would be money left in the house for her. He hid some money in the basement of her home. Her brother found it there and gave it to her. She gave it to Mr. Stoll, who told her: ''If anything unforeseen happens, that will take care of you; nobody knows it is there but you and me, and whoever goes first the other will get it.'' This was in 1943, however, prior to the time when her alleged special services commenced. He replaced the money in the basement cache, but afterwards removed it. None of his relatives were present to look after him, and he had no one to take care of him but Mrs. Smith. She received her pay for his room and board regularly every month. She gave as her reason for failing to require monthly payment for her special services the facts that Mr. Stoll said he would leave her well provided for, and that meantime he needed his money. She was not then aware that he had any money other than ''what was coming in''. She never told him that she was charging him $75 a month for these extra services. ''He was there, and I was taking care of him, and I done the best I could for him, thinking that he would leave me something.'' She arrived at the figure of $75 a month as a proper charge when she found that Mr. Stoll had not left her anything and had left ''everybody else'' something. She thought she ''had it coming''. In response to a question as to whether she considered $75 a month a reasonable amount for her services, she said: ''Well, it isn't very much. I had to turn down work that I could be paid for, to take care of him.''

Mrs. Ione E. Sax testified: She was acquainted with the decedent. She lived next door to the claimant, Mrs. Smith. During the period covered by Mrs. Smith's claim, Mrs. Sax visited in claimant's home at least

once a day, and sometimes twice. When Mr. Stoll was ill, Mrs. Smith sometimes called upon Mrs. Sax to come over and help her with him, and she did so. Mrs. Smith gave Mr. Stoll whatever nursing care or help was necessary. "At times he just passed completely out and she would try to revive him." Mr. Stoll told Mrs. Sax that he would see that Mrs. Smith was well paid for any trouble that he had caused her. He never told her "in so many words" that Mrs. Smith wasn't being paid enough for what she was doing for him, but he said: "I'll see that she is well paid for it—for the care that she is giving me." Mrs. Smith "did sewing" and, at different times, she was unable to carry on such work on account of having to take care of Mr. Stoll. When Mr. Stoll first went there to live he was never very well, and during the last two years he was very ill most of the time. He was bedfast very often. Mrs. Sax would go in and Mr. Stoll wouldn't be up for breakfast, and Mrs. Smith would say that he was sick, and she was taking his breakfast up to him. That happened very often. She did not mean to say, however, that he was a shut-in or an invalid. She was present at times when people came with the rentals of the houses, and she knew that Mrs. Smith had taken "different things" to the bank and to the hospital for Mr. Stoll. "Q. [by the court] What you saw her do was collecting the bills and collecting the rents? Just winding up his business? A. After he had closed his store, he had a lot of money out and people came to the house paying on them."

Carl Trekell testified: He was formerly employed by Mr. Stoll in his grocery store and butcher shop. He visited him at Mrs. Smith's home. He had worked for Mr. Stoll for a couple of years, and maintained

very friendly relations with him at that time and afterwards. He knew that Mr. Stoll was ill; "very much so". It was a "heart condition". Mr. Stoll ran a credit business, and had "accounts out" after he retired. Mr. Trekell knew that Mrs. Smith took care of Mr. Stoll's business accounts. After Mr. Stoll retired, she made the collections for him. He did not know whether or not she did the book work and kept the accounts, but when he asked Mr. Stoll if there was anything that he (Mr. Trekell) could do for him, he said: "No, everything is well taken care of; Mrs. Smith takes care of things." He took Mr. Stoll over to his (Trekell's) house for an hour or two many a time, just for a little relaxation. Mr. Stoll was quite often laid up in bed, and Mr. Trekell knew that Mrs. Smith took care of him during those periods. Mr. Stoll told Mr. Trekell how much he appreciated his home. "He has mentioned on several occasions that she would be well paid for the care that he was getting there at her home." Mr. Trekell did not really observe what Mrs. Smith did for Mr. Stoll, as he was in the home very little. He did know of his own knowledge that she went to the hospital to see him, took care of his affairs, and took his mail and other matters "to be opened up". Answering a question on cross-examination as to how much of the time Mr. Stoll was "up and around", he said: "Well, sometimes, most of the time, when he could, he would walk over to the park; but numerous times he has passed out on the way over there and had to be taken to the hospital. He had a very bad heart, as you know."

Mrs. Lela Van Sicklin testified: She has been a practical nurse for 25 years and is acquainted with Mrs. Smith. She visited Mrs. Smith's home many

times while Mr. Stoll was living there, and observed that Mrs. Smith was caring for him. On one occasion when Mrs. Van Sicklin was present, Mr. Stoll was ill and Mrs. Smith took two meals up to him. Many times when Mrs. Van Sicklin was there, Mr. Stoll was not able to go to the park, and Mrs. Smith took him there in her car and went back for him afterwards and brought him home. She took care of his personal needs, like a regular nurse would do. Mrs. Van Sicklin was at Mrs. Smith's home maybe once or twice a week; "then there would be times when I wouldn't be there in maybe a month." Mrs. Smith was taking care of Mr. Stoll during the period covered by her claim. In Mrs. Van Sicklin's opinion, the reasonable value of services as a practical nurse during that period was $5 a day plus meals and room.

The inventory and appraisement on file shows decedent's estate to be of the value of $29,034.13. His heirs at law appear to have been three brothers, one sister, three nieces, and two nephews. His will contained two specific bequests of $300 each and one of $400, none of which was to any of his heirs at law. The residue of his estate he devised and bequeathed to one of his nieces.

■■■ A claim against a decedent's estate, which has been rejected by the executor or administrator, cannot be allowed by a court "except upon some competent satisfactory evidence other than the testimony of the claimant". Section 19-704, O. C. L. A.; *Harding v. Grim*, 25 Or. 506, 510, 36 P. 634; *Goltra v. Penland*, 45 Or. 254, 264, 77 P. 129. The allowance or rejection of such a claim by a probate court after a summary hearing is regarded as a judgment in an action at law and, on appeal, the question is not tried de novo. The

sole function of the appellate court is to determine whether or not there is any ''competent satisfactory'' evidence in the record supporting the findings of the court below. *In re Steele's Estate,* 152 Or. 49, 62, 52 P. 2d 207; *In re Millon's Estate,* 154 Or. 615, 618, 61 P. 2d 1030; *Hiller v. Smith,* 171 Or. 428, 432, 137 P. 2d 828; *In re Richter's Estate,* 181 Or. 360, 364, 365, 181 P. 2d 133; *In re Daniels' Estate,* 185 Or. 642, 671, 205 P. 2d 167. The action having been tried by the court below without the intervention of a jury, the judge's findings have the force and effect of a verdict, and this court is bound by such findings if there is competent and material evidence to sustain them. *In re Estate of McLain,* 126 Or. 456, 464, 270 P. 534. The burden was upon the claimant to establish her claim by ''competent satisfactory evidence'' independent of her own testimony. *In re Estate of Banzer,* 106 Or. 654, 657, 213 P. 406; *Uhler v. Harbaugh,* 110 Or. 609, 616, 224 P. 89; *Seaton v. Security S. & T. Co.,* 131 Or. 261, 268, 271, 282 P. 556.

Where services are rendered in reliance solely upon the recipient's generosity, no action can be maintained for the value of the services. 58 Am. Jur., Work and Labor, section 8; Anno., 54 A. L. R. 552; Ann. Cas. 1913 A, 480. It has been held in a number of cases, however, that, even if there was no express contract, nevertheless, if there was an expectation of payment on the part of the person who rendered the services, although he supposed that such compensation would be made by a provision in the will of the recipient, and if the evidence showed that the recipient recognized his obligation in the premises by stating to others that he expected to make full compensation therefor, then, on the death of the recipient without having made

payment in any manner, the person who performed the services may recover by action in *quantum meruit* against the recipient's estate. *Gall v. Gall,* 27 App. Div. 173, 50 N. Y. S. 563; *Robinson v. Raynor,* 28 N. Y. 494; *Shakespeare v. Markham,* 10 Hun. (N. Y.) 311, affirmed 72 N. Y. 400; *Miller v. Lash,* 85 N. C. 51, 39 Am. Rep. 678.

■ It is a general rule that, where one performs valuable services for another at his request, and there is no express contract to pay for such services, the law implies a promise on the part of the recipient to pay therefor what the services may reasonably be worth. The implication is said to arise from the recipient's mere acquiescence in the rendition of the services, and the claimant should be permitted to recover under such circumstances, unless the evidence shows that the services were rendered without expectation of compensation, or that there was an understanding between the parties that they should be rendered gratuitously. *In re Estate of McLain,* supra (126 Or. 456, 459, 270 P. 534); *In re McKinney's Estate,* 175 Or. 28, 36, 149 P. 2d 980, 151 P. 2d 459; *Franklin v. Northrup,* 107 Or. 537, 551, 215 P. 494. The question in such cases is one of fact, to be determined by the triers of the facts. *In re Swank's Estate,* 163 Or. 367, 371, 97 P. 2d 723; *Franklin v. Northrup,* supra.

■ That decedent expected to compensate claimant for her services was clearly and substantiall established by evidence of his declarations to third persons. 34 C. J. S., Executors and Administrators, section 452, text and note 87; *Estate of McLain,* supra (126 Or. 456, 462, 270 P. 534).

■ It is suggested that the evidence of the value of the services was insufficient. We think that the sug-

gestion is without merit. Claimant's answer to the specific question as to whether she considered $75 a month a reasonable amount for her services, while somewhat indirect, was affirmative in effect, and was received without objection. On that particular point, it was sufficient in itself, and needed no corroboration. *Littlepage v. Security S. & T. Co.,* 137 Or. 559, 560, 3 P. 2d 752. There was, however, corroborating evidence, and, taking it all together, the evidence was sufficient.

■ We are of the opinion that the corroborating evidence in this case was sufficient to support claimant's contention that she performed the services for which she seeks to recover, and that such services were neither rendered nor accepted with the understanding that they were to be gratuitous. The circumstances were such that a promise to pay may be implied. *Estate of Kukas,* 120 Or. 542, 543, 252 P. 947; *Littlepage v. Security S. & T. Co.,* supra (137 Or. 559, 561, 3 P. 2d 752). While the corroborating evidence did not establish in detail the services performed, the testimony of two of the witnesses showed that they knew the general character of such services. This was sufficient in this connection. *Hiller v. Smith,* supra (171 Or. 428, 434, 137 P. 2d 828).

■ It is contended that, claimant having received payments at regular intervals from decedent for board and room, there is a presumption that such payments were in full for all services, and that she cannot recover additional compensation from his estate for wages or salary, in the absence of "competent satisfactory" evidence of a contract to pay therefor. 24 C. J., Executors and Administrators, section 880; 34 C. J. S., Executors and Administrators, section 370. We have

held, in this connection, that domestic wages are presumed to be paid at certain intervals, and that, when a claim for services of that sort, covering any great period of time, is presented against a decedent's estate, the burden is upon the claimant to rebut the presumption of payment. *In re Estate of McLain,* supra (126 Or. 456, 460, 270 P. 534). While the services for which claimant was paid regularly consisted of board and lodging, and those for which she now claims payment were of a different character, we think, in view of the situation of the parties, that the presumption of payment obtains in this case, and it was necessary for claimant to overcome such presumption by competent evidence. We are of the opinion that there was sufficient corroboratory evidence to overcome the presumption.

▉▉▉▉ No evidence whatever was offered by the executor. He contends that the court erred in not granting his motion for a new trial. The newly-discovered evidence upon which he relies in this connection is detailed in affidavits which he filed in support of his motion. These may be summarized as follows: (1) The executor himself deposed that, on October 3, 1947, claimant told him of her claim and discussed it with him; that he asked her if she had had any [other] roomers or boarders in her home during the period for which she was claiming compensation for services allegedly performed for Mr. Stoll, and that she said that she did not; that he thereupon told her that her claim was questionable and that he would be obliged to reject it; that, after the hearing on the claim on February 4, 1949, he telephoned to a Mrs. Esther Erickson, a resident of Portland, who had been a friend of decedent's, informed her of the court's decision, and told her of

claimant's testimony to the effect that decedent was confined to his bed in claimant's home during most of the time covered by her claim, and that claimant had taken care of Mr. Stoll's business affairs and nursed him and waited upon him during that period; that on February 7, 1949, Mrs. Erickson telephoned to him and gave him the name of Robert Robinson as that of a person who had been acquainted with decedent and had lived at claimant's home during July, August and September, 1947, his room being adjacent to decedent's; that, on February 8, 1949, the executor obtained the affidavit of said Robinson, which comprised newly-discovered evidence, and also obtained from him the name of a lady (Mrs. Natalie B. Perry) who, from March 6, 1946, to about May 27, 1947, had occupied the room later occupied by Robinson, and whose affidavit the executor likewise secured; that the executor did not know of the existence of either Mr. Robinson or Mrs. Perry at the time of the trial, and that he implicitly believed claimant's statement that no roomers or boarders had lived in her home during the period in question. (2) Robert Robinson deposed that he roomed at claimant's home during July, August and September, 1947; that, during that period, Mr. Stoll was rooming and boarding at claimant's home, and claimant prepared his meals and took care of his room; that deponent was well acquainted with Mr. Stoll and knew his habits; that, except for two days in July, 1947, when Mr. Stoll was in the hospital, and for two or three days after he returned from the hospital, Mr. Stoll was not confined to his room, but was up and around the house, and ate his meals downstairs as usual, and that at no time did he require or was rendered special nursing care by claimant; that claim-

ant did not render Mr. Stoll any special services of any kind, except tray service during the two or three days he was in bed after returning from the hospital; that, during said period, Mr. Stoll did not require the services of claimant to handle any of his affairs, business or otherwise, and claimant did not render any such services to him; that, during such period, Mr. Stoll made frequent trips to see his friends in different parts of the city and to visit Laurelhurst Park, and was not a shut-in; that, during said period, and shortly before the death of Mr. Stoll, claimant stated to deponent that she knew very little, if anything, about Mr. Stoll's business affairs, and that Mr. Stoll refused to discuss his business and private affairs with her; that, shortly after Mr. Stoll's death, claimant told deponent that Mr. Stoll had told her before he died that she was not mentioned in his will, and further stated that she was not surprised that she had been left out of the will, or words to that effect. (3) Natalie B. Perry deposed that she roomed at claimant's home from about March 6, 1946, to May 27, 1947; that, during that time, Mr. Stoll roomed and boarded at claimant's home and occupied the room next to hers; that claimant prepared morning and evening meals for Mr. Stoll; that Mr. Stoll and deponent used the same bathroom; that Mr. Stoll occupied the bathroom between the hours of 9 and 10 a. m., and, after shaving, would go downstairs and have breakfast prepared by claimant; that Mr. Stoll took daily walks under all weather conditions; that, while deponent was on duty as a waitress at a tavern on the southeast corner of 39th and Stark Streets, she frequently saw Mr. Stoll walking to and from Laurelhurst Park, where he spent most of his leisure time; that he always went alone and unassisted,

and never required any care or attention from anyone, except on two occasions when he was taken to the hospital; that, except on those occasions, deponent never saw Mr. Stoll when he needed care or assistance from anyone, or special nursing services from Mrs. Smith or any one else, and never saw claimant render any such services; that, during said period, deponent had occasion to observe Mr. Stoll many times, and never saw him confined to his room on account of sickness, except for a day or two after returning from the hospital; that the only business service claimant ever rendered Mr. Stoll was to accept rental money for him when he happened to be away from the premises; that Mr. Stoll took care of his own business affairs, and that she remembered especially that at tax time he worked on his income tax returns without aid or assistance from anyone.

The claimant filed a counter affidavit in which she stated that Mr. Little was mistaken in alleging that she had told him that she had no roomers or boarders other than Mr. Stoll during the period of time in question; she admitted that Robert Robinson roomed at her place for a period of time during the latter part of the year 1947, but said that he received no board, and that he was employed, and was away from his room during his working hours, and was not in a position to observe the care and services rendered by her to Mr. Stoll; she likewise admitted that Natalie B. Perry roomed at claimant's home for the period of time mentioned in her affidavit, but said that she did not board there, and that she also was employed and away from her room during her working hours, and was not in a position to observe the services rendered to Mr. Stoll; further, claimant alleged that she never

stated that Mr. Stoll was in bed most of the period of time covered by her claim.

Section 5-802, subd. 4, O. C. L. A., authorizes a court to set aside a former judgment and grant a new trial on the motion of the party aggrieved, for "newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial".

> " * * * Newly-discovered evidence which will justify a court in setting aside a verdict and granting a new trial must fulfill the following requirements: '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradicting the former evidence'; 14 Ency. Pl. & Pr. 791; Berry v. State, 10 Ga. 511. * * * ''

*State v. Hill,* 39 Or. 90, 94, 65 P. 518.

We are of the opinion that the showing made by the executor was insufficient to have justified the court in setting aside the judgment and granting a new trial. There was no showing whatever that he used due diligence to discover such evidence. The record is silent as to who Mrs. Esther Erickson is, except that she was a friend of decedent's; as to why the executor reported to her the result of the hearing; and as to why, if Mrs. Erickson was likely to know of the existence of evidence not known by the executor, he failed to inquire of her before the hearing. It would seem, therefore, that the showing made by the executor

respecting the alleged newly-discovered evidence was lacking in at least one of the elements necessary to justify the court in setting aside the judgment and granting a new trial. *Seaton v. Security S. & T. Co.*, 131 Or. 261, 272, 274, 282 P. 556. Under the circumstances, the trial court did not err in denying the motion.

The judgment appealed from is affirmed.